### OLBERG v. KROEHLER.

(Circuit Court of Appeals, Eighth Circuit. July 25, 1924.)

No. 6543.

**1. Parent and child ☞13(1)—Elements of parent's liability for negligence of child operating automobile stated.**

In determining parent's liability, under Wisconsin rule, for negligence of adult child in driving family car, it must be determined whether child was using car by his permission or authority, either express or implied, and whether venture on which child was engaged when so driving was one in which he was interested or owed a duty.

**2. Evidence ☞595—Facts from which another fact inferable evidence of that fact.**

Facts from which another fact may be rationally inferred are evidence of that fact.

**3. Evidence ☞589—Mere denial of facts by interested parties having peculiar knowledge not conclusive, when opposed by convincing circumstances.**

A mere denial by interested parties of facts peculiarly within their knowledge will not be held conclusive, when opposed by probable and convincing circumstances, especially when denials are accompanied by evasive answers to questions and answers are open to reservations.

**4. Master and servant ☞332(1)—Whether child drove automobile with parent's permission held for jury.**

In action for injuries to pedestrian, struck by defendant's family automobile driven by his adult daughter, whether daughter was using car by permission of mother, in control of car during father's absence, *held* for jury.

**5. Master and servant ☞302(1)—Adult daughter, operating family automobile, held parent's agent.**

Act of adult daughter of owner of family automobile in transporting minor child to lunch after taking him to hospital to see his mother, dwelling house being closed, was performance of thing in which father was interested, and in connection with which he owed duty, for purpose of determining father's liability for daughter's negligence in striking pedestrian while on such mission.

**6. Municipal corporations ☞706(7)—Contributory negligence of pedestrian, struck by automobile, held for jury.**

Contributory negligence of pedestrian, run down by an automobile, at street intersection, *held* for jury.

In Error to the District Court of the United States for the District of Minnesota; John F. McGee, Judge.

Action at law by Marie Olberg against J. T. Kroehler. Judgment for defendant, and plaintiff brings error. Reversed.

Humphrey Barton, of St. Paul, Minn. (Peter E. Kamuchey, of St. Paul, Minn., on the brief), for plaintiff in error.

C. W. Wright, of Minneapolis, Minn. (J. M. Clancey, of Stoughton, Wis., on the brief), for defendant in error.

Before KENYON, Circuit Judge, and AMIDON and SCOTT, District Judges.

SCOTT, District Judge. An action at law by Marie Olberg against J. T. Kroehler, to recover damages on account of personal injuries sustained by reason of being struck by defendant's automobile, while being driven by his 24 year old daughter, not actually residing in the family, but in nurse service at a hospital in La Crosse, Wis., the town of defendant's residence. The daughter in question, however, was a frequent visitor at the father's home while off duty. The defendant owned a farm near Houston, Minn., from which he had removed to La Crosse, and on which during the farming season he spent a great deal of his time during the week at work. Defendant owned the automobile in question, an ordinary touring car, which he testified had been purchased for business and the convenience of the family. When the father was absent at the farm, the automobile was left in charge of the mother. The family consisted of the father, mother, the daughter in question, a younger daughter 22 years old, and a son 15 years old. All of the children had learned to drive the automobile, and on occasion did so. On the 16th of April, 1922, the father and the young son were out on the farm. The younger daughter was in school, and the mother being in poor health, her physician advised her going to a hospital in La Crosse. At the suggestion of the physician and with the consent of the mother, the daughter Avis took the car from the family garage and took her mother to the hospital, where she herself was in service. This left the home vacant.

It appears that the following afternoon, April 17th, the young son was expected to return to the city, and that Avis, knowing of this, went to the home, took out the automobile, and met him at the railroad station, from which place they drove together to the hospital to visit their mother. Avis and her brother both remained with the mother at the hospital until nearly 6 o'clock in the evening, when they left together in the au-

tomobile, Avis driving; the purpose being to first call on a friend, then to get some gas for the car, and then proceed to another friend's house, where the boy would get dinner. This was occasioned because their house was vacant, and no one at home to prepare the meal. The father usually left the automobile supplied with gas when he left for the farm for extended absences, and the daughter testified, when such supply was exhausted, she usually procured gas at a filling station and paid for it herself. She was about to procure additional gas when the accident in question occurred. The accident occurred as the daughter turned the car from Main street, in La Crosse, into Fifth street on the crossing.

Plaintiff's testimony tends to show that she was employed at a dry goods store, and shortly before the accident had concluded her day's work and was proceeding easterly on the north side of Main street, in La Crosse, in company with Miss Kinney, with the purpose of taking a street car a block farther on. Plaintiff was walking on the left or north side of Miss Kinney. Fifth street runs north and south, intersecting Main street. As plaintiff and Miss Kinney reached the curb at the Fifth street crossing, they observed Avis and her brother proceeding westward on the north side of Main street in the car. Plaintiff testifies: "I stepped out on the street, and I looked up Main street, if any car was coming down or going west on Main. * * * I saw a car coming down, going west on Main, and I looked if they were going—if they give a signal to turn the corner, and no signal was given, and the car was going straight ahead, and I took it to go down Main street after it had passed the corner, and I started to cross, and I had taken a few steps, and I saw something glittering by my leg, I looked down and it was a bumper of a car, and I thought of trying to save myself; I threw myself over the right—the left-hand fender—tried to get hold, and I fell, slipping backwards, and that is all I knew." Her further testimony tends to show that before she and Miss Kinney reached the center of Fifth street the automobile had proceeded directly west on the north side of Main a little past the center of Fifth street without signaling or giving other evidence of turning; that plaintiff supposed the car was proceeding westward on Main street, and proceeded to cross; that plaintiff was on the north side of Miss Kinney, and did not observe the car, which, as her testimony tends to show, suddenly turned to the left into Fifth street.

Mrs. Hazel McDonald, a spectator, testifies relative to the progress of the car: "They didn't seem to make any attempt, as they were going to turn the corner, until they got a little ways past, to turn it; that was my idea of it anyway; and all of a sudden she turned, but I didn't hear any signals." This witness further testifies: "My idea is that she was not on the east side. Q. Your idea is that she was hit on the west side of Fifth street? A. More so than on the east side. Q. How far off the center of the Fifth street side is your idea where she was hit? A. She was not off the curbing very far—5 or 6 feet." Plaintiff's testimony tends to show that the car was going at a rate of about 12 miles an hour, and did not slacken speed until it was upon the plaintiff. The car struck the plaintiff and injured her.

At the conclusion of the evidence in the case the defendant moved for a directed verdict upon three grounds: First, that plaintiff had failed to establish by any evidence any negligence of the defendant; second, that the plaintiff herself was guilty of contributory negligence, which would bar a recovery; third, that the defendant was not responsible for the conduct of the driver of the automobile at the time plaintiff was injured. The court did not rule specifically on the first and third grounds of the motion, but specifically sustained the second ground, directing a verdict upon the finding that the plaintiff as a matter of law was guilty of contributory negligence.

That there is substantial evidence in the record tending to show that the driver of the car was negligent does not admit of question. The assignment of errors, six in number, present two questions for consideration on this review: (1) Was the defendant liable for the injury, conceding the negligence of the daughter? and (2) was plaintiff guilty of contributory negligence as a matter of law?

On the first question defendant in error contends that the case is ruled by Crossett v. Goelzer, 177 Wis. 455, 188 N W 627, and Geffert v. Kayser, 179 Wis. 571, 192 N. W. 26, both Wisconsin cases; that being the state in which the accident in the instant case occurred and the parties resided. It is contended on the authority of these cases that the rule of law in Wisconsin is adverse to the so-called "family purpose" doctrine, and therefore decisive of the case at bar. The Supreme Court of Wisconsin, in consideration of the Crossett Case, supra, made

a somewhat extensive examination of decisions of the courts of other states relative to the "family purpose" doctrine, and attempted to crystallize a satisfactory rule. The court quoted amply from decisions by the courts of last resort in the states of Tennessee, Illinois, Massachusetts, and New York. It may be profitable to examine these cases, to ascertain just what the Supreme Court of Wisconsin in the Crossett Case and in the Geffert Case, supra, did hold.

In King v. Smythe, 140 Tenn. 217, 204 S. W 296, L. R. A. 1918F, 293, the Supreme Court of Tennessee discussed the "family purpose" doctrine as follows:

"It seems to us that the foregoing reasoning is more concerned with what the learned court considered pure logic than with the practical administration of the law. If a father purchases an automobile for the pleasure and entertainment of his family, and, as Dr. Smythe did, gives his adult son, who is a member of his family, permission to use it for pleasure, except when needed by the father, it would seem perfectly clear that the son is in the furtherance of this purpose of the father while driving the car for his own pleasure. It is immaterial whether this purpose of the father be called his business or not. The law of agency is not confined to business transactions. It is true that an automobile is not a dangerous instrumentality so as to make the owner liable, as in the case of a wild animal loose on the streets; but, as a matter of practical justice to those who are injured, we cannot close our eyes to the fact that an automobile possesses excessive weight, that it is capable of running at a rapid rate of speed, and, when moving rapidly upon the streets of a populous city, it is dangerous to life and limb, and must be operated with care. If an instrumentality of this kind is placed in the hands of his family by a father, for the family's pleasure, comfort, and entertainment, the dictates of natural justice should require that the owner should be responsible for its negligent operation, because only by doing so, as a general rule, can substantial justice be attained. A judgment for damages against an infant daughter or an infant son, or a son without support and without property, who is living as a member of the family, would be an empty form. The father, as owner of the automobile and as head of the family, can prescribe the conditions upon which it may be run upon the roads and streets, or he can forbid its use altogether He must know the nature of the instrument and the probability that its negligent operation will produce injury and damage to others. We think the practical administration of justice between the parties is more the duty of the court than the preservation of some esoteric theory concerning the law of principal and agent. If owners of automobiles are made to understand that they will be held liable for injury to person and property occasioned by their negligent operation by infants or others who are financially irresponsible, they will doubtless exercise a greater degree of care in selecting those who are permitted to go upon the public streets with such dangerous instrumentalities. An automobile cannot be compared with golf sticks and other small articles, bought for the pleasure of the family. They are not used on public highways, and are not of the same nature as automobiles."

It will be seen that the Tennessee court in the decision quoted extends the "family purpose" doctrine to include a case where a father purchases an automobile for the pleasure and entertainment of his family and gives an adult son, who is a member of his family, permission to use it for pleasure. In such instance the father is declared liable, even though the son may be at the time using the automobile for his own exclusive pleasure. We think the Tennessee court in this case embraced the "family purpose" doctrine to its full extent, and took a position in advance of that accepted by some other courts, as we shall presently see.

In Arkin v Page, 287 Ill. 420, 123 N. E. 30, 5 A. L. R. 216, the Supreme Court of Illinois said:

"It seems rather a fantastic notion that a son, in using the family automobile to take a ride by himself for pure pleasure, is the agent of his father in furnishing amusement for himself, is really carrying on his father's business, and that his father, as principal, should be liable for the result of the son's negligent manner of furnishing the entertainment to himself. * * * If the son is his father's agent to amuse himself with an automobile, he must also be a like agent for his own amusement with bicycles, horses, and buggies, guns, golf clubs, baseballs and bats, rowboats and motor and sail boats, if these should happen to be provided, and if, in carrying on his father's business by the use of any of these articles, as his father's agent, to amuse his father's son, he should negligently injure any one, his father would be liable as principal. Such a refinement of reasoning has not been recognized until since the advent of the auto-

mobile or in the case of any other instrumentality."

The Supreme Court of Illinois here seems to have rejected the rule adopted by the Tennessee court in a case presenting the precise question, viz. where the son was using the family automobile exclusively for his own pleasure.

In Smith v. Jordan, 211 Mass. 269, 97 N. E. 761, the Supreme Judicial Court of Massachusetts states the rule thus:

"The principles of law which govern this case are plain. A father is not liable for the torts of his minor son, simply because of paternity. There must exist an authority from the father to the son to do the tortious act, or a subsequent ratification and adoption of it, before responsibility attaches to the parent. This authority may be express, or it may arise by implication from all the attendant circumstances. The wrongful act must be performed by the son in pursuance of the business, incident, or undertaking authorized by the father before the latter can be held liable. Such authority may be found in the actual presence of the parent, in express or implied direction, or in a precedent course of conduct. If the act is within the general scope of authority conferred by the father, or in carrying out the enterprise for which the minor has been commissioned, then the father may be liable even though he had no knowledge of the specific conduct in question and it was contrary to his direction. If the act is not done by the son in furtherance of the father's business, but in performance of some independent design of his own, the father is not liable. The controlling rules of law are the same whether the business in question concerns the operation of an automobile or any other matter."

The holding of the Massachusetts court is: "A father is not liable for the torts of his minor son, simply because of paternity. There must exist an authority from the father to the son to do the tortious act, or a subsequent ratification and adoption of it, before responsibility attaches to the parent." The language just quoted we think hardly intended to be literally accepted. We think the court did not mean to imply that the father must either authorize or ratify the committing of the tort, but that he must authorize or ratify the project or venture in which the son was engaged. The language immediately following indicates this, for the court says: "This authority may be express, or it may arise by implication from all the attendant circumstances. The wrongful act must be performed by the son in pur-

suance of the business, incident, or undertaking authorized by the father before the latter can be held liable." Thus it would appear under this rule that, if the son were engaged in the execution of some family or parental incident or undertaking with the authority of the father, then the father will be held to have made it his business and to be liable.

In Van Blaricom v. Dodgson, 220 N. Y. 111, 115 N. E. 443, L. R. A. 1917F, 363, the Court of Appeals of New York discusses the doctrine as follows:

"On its face a proposition seems to be self-contradictory which asserts that a person who is wholly and exclusively engaged in the prosecution of his own concerns is nevertheless engaged as agent in doing something for some one else. * * * The attempt is made, however, to reconcile these apparently contradictory features of this proposition by the assertion that the father had made it his business to furnish entertainment for the members of his family, and that therefore, when he permitted one of them to use the car, even for the latter's personal and sole pleasure, such one was really carrying out the business of the parent, and the latter thus became a principal and liable for misconduct. This is an advanced proposition in the law of principal and agent, and the question which it presents really resolves itself into the one whether, as a matter of common sense and practical experience, we ought to say that a parent who maintains some article for family use and occasionally permits a capable son to use it for his individual convenience ought to be regarded as having undertaken the occupation of entertaining the latter and to have made him his agent in this business, although the act being done is solely for the benefit of the son. That really is about all there is to the question. Not much can be profitably said by way of amplification or in debate of the query whether such a liability would rest upon reasonable principles, or whether it would present a case of such theoretical and attenuated agency, if any, as would be beyond the recognition of sound principles of law as they are ordinarily applied to that relationship. The question largely carries on its face the answer, whichever way to be made. Unquestionably, an affirmative answer has been given by the courts of some states [citing cases]. But it seems to us that such a theory is more illusory than substantial, and that it would be far-fetched to hold that a father should become liable as principal every time he per-

mitted a capable child to use for his personal convenience some article primarily kept for family use."

The substance of the holding in the Van Blaricom Case, supra, is that the father is not liable where the automobile is being used by the son exclusively on his own venture and for his own pleasure, even though with the permission of the father. It will be seen that the court in this case stops short of the limit reached by the Tennessee court in King v. Smythe, supra, and that the latter court refused to follow the New York court.

We come now to an examination of Crossett v. Goelzer, supra. We quote the Wisconsin court:

"The facts are these: Elton, the son, at the time of the accident, was nearly 17 years of age and a competent driver. He had driven the automobile, which was owned by his father, a seven-passenger Hudson, 29 horse power, very frequently, using it to go to school, to take his sisters to and from school, and to take his mother out driving for pleasure and shopping. The family consisted of the father, mother, Elton, two younger brothers, one older sister, and one younger sister. The father drove the car at times, usually on Sundays, and the car was used generally for the pleasure, comfort, and convenience of the family. The car was not taken out without the father's permission, except as directed by the mother, and the father at all times knew where the car was. On the evening in question, Elton proposed to take his sisters and some friends of his and theirs skating. The proposed trip was submitted to the father for his approval, and Elton had the father's permission to take the car for the purpose of taking his sisters and his and their friends to the skating park. He procured the car from the garage, returned to his home for his sisters, then called for their friends, and then for his cousin. He left these at the skating rink, and then went to call for a Miss Giese, who was an employee in his father's office, and, accompanied by Miss Giese and Clarence Schumann, he went some blocks to the home of a cousin to procure from him the skates, which his cousin had borrowed the day before, but had not returned. The father was not advised of the fact that Elton was to go to the home of his cousin for the purpose of procuring his skates, and it was while Elton was driving the car on his way to get the skates that the accident happened. The father testified that the car was a family car; that Elton drove it with his permission, so that the family might have the use of the car and receive entertainment and pleasure thereby. It also appeared that Elton used the car to some extent for household errands and shopping; that he at times used it for his own purposes, when none of the family were with him."

Following the above statement and a discussion of the cases heretofore quoted, the Wisconsin court said:

"The father is not liable for damages inflicted by the negligent operation of his automobile by his minor, competent son because of the relationship existing between the owner and the operator, but liability must be predicated upon the same fundamental principles of agency which would govern in the case of the use of any other instrumentality owned by the father and used or operated by the son. * * * We come now to the matter of the application of the principles stated to the facts in this case. The circumstances under which the trip in question were undertaken do not seem to be clearly indicated in the testimony. In addition to the facts already stated, it appears that Elton, the son, on the evening in question asked his father's permission to take the car to go skating. The trip was apparently suggested by him and not by the father, although the father knew Elton's plans for the evening and that he intended to take his sisters as well as his and their friends. Upon the evidence, as it stands, we do not think it can be said, as a matter of law, that the trip was undertaken at the request and for the benefit of the father, neither can it be said, as a matter of law, that the trip was undertaken solely by Elton for his own benefit and to accomplish his own purposes. A jury issue was presented upon this phase of the case.

"While the facts are practically undisputed, it cannot be said that the inferences, to be drawn therefrom are so plain that the minds of reasonable men cannot come to different conclusions in regard to them. If the son procured permission to take the automobile upon the evening in question for purposes of his own, the mere fact that his sisters accompanied him, while it is a circumstance to be considered, is not conclusive. To hold it conclusive would be in effect to adopt the family purpose doctrine. The defendant made a timely request that this issue be submitted to the jury by the special verdict. The refusal of the court to submit the issue was erroneous and the judgment must be reversed for that reason. If it be found by the jury that the trip was

undertaken at the request and for the benefit of the father, it is considered that, as a matter of law, Elton was acting within the general scope of his authority in going to the home of his cousin to procure his skates. The case having been fully tried upon all other issues, it will be remanded for trial upon the single issue as to whether or not the trip in question was undertaken at the request of and for the benefit of the father. The judgment will go according to the determination by the jury of that issue; the defendant to recover costs in this court."

Now, it will be seen that, while the Wisconsin court holds that the element of agency must exist, yet this element may be supplied either by the express request of the father, or by consent or authority implied from circumstances where the act or venture concerns members of the family and not exclusively the venture or business of the wrongdoer. In the Crossett Case the son, Elton Goelzer, had initiated the plan for the skating excursion, but it involved taking his sisters and their friends with him. "The proposed trip was submitted to the father for his approval, and Elton had the father's permission to take the car for the purpose of taking his sisters and his and their friends to the skating park." In the light of these facts, the Wisconsin court held that it was a jury question whether the trip was undertaken at the request and for the benefit of the father. It seems to us that the court slightly slurred the situation here, and left the rule somewhat beclouded. The facts were undisputed that the son initiated the project, that it involved the convenience and pleasure of other members of the family, that this was one of the purposes for which the car was kept, and that the father had given his permission. It seems to us that the court should have said definitely that under these circumstances the father was or was not liable. However, the court did not say that the father was not liable but said that was a jury question. Now, while this decision rejects the "family purpose" doctrine in the fullness accepted by the Tennessee court, yet we think it does embrace the doctrine in a degree.

The case of Geffert v. Kayser, supra, can be more easily disposed of. In that case the son procured his father's permission to use the car to take a young lady, not a member of the family, to a dance. The purpose was purely personal to the son, and there was no other element of family use and no element of agency.

1 F. (2d)—10

[1-4] We come now to a consideration of the instant case. In determining the father's liability two questions must be answered: First, was Avis using the car by permission or authority either express or implied? and, second, was the venture one in which the father was interested or owed a duty? With respect to the first question, the evidence introduced on the part of the plaintiff is largely circumstantial. But circumstantial evidence is not always the least satisfactory. Facts from which another fact may be rationally inferred are evidence of that fact. A mere denial by interested parties of facts peculiarly within their knowledge will not be held conclusive, when opposed by probable and convincing circumstances. Especially is this true when the denials are accompanied by evasive answers to questions and answers open to reservations. It is undisputed on this record that the defendant father had owned the car or a car for about eight years; that it was kept for the ordinary convenience and use of the family; that there were three children in the family, all of whom had learned to drive the car, and defendant drove it on occasion; that the car was usually kept at the home garage; that there were two keys to the garage, one carried by the father, and one kept in the house for the use of the family; that the father usually, when leaving for the farm, often for a period of days, left the car supplied with gas; that when the father was away the mother had control of the car; that the daughter in question, over a long period of time, had used the car; that on the 16th of April, 1922, when the mother had occasion to go to the hospital, the daughter took the car out of the garage, took her mother to the hospital, and returned the car to the garage; that the mother and daughter were staying at the same hospital; that on the afternoon of April 17th, the son being expected to return home, the daughter performed the very usual service of meeting her brother at the station with the car and driving him to the hospital to visit his mother; that the daughter and the son both remained with the mother until nearly 6 o'clock in the evening; that they both left together, with the purpose of taking the son to a place where he could procure his dinner.

In these circumstances, might not the jury reasonably infer that the mother was consenting to the use of the car for this purpose? It was not necessary in the circumstances that the mother give express consent

or authority if she was acquainted with the purpose. There is no evidence in the record that the daughter, or any other child of the family, had ever been refused permission to use the car There is evidence that the daughter in question repeatedly bought gas while her father was away, because the supply left by him had been exhausted. We think that it cannot be said as a matter of law that in these circumstances a jury would be unwarranted in drawing the inference of authority and permission. Now it is true the defendant and his wife gave testimony to rebut such inference, but we think their testimony and their manner of giving it leaves the question peculiarly to the province of the jury. We here review some of the questions and answers of the defendant; his testimony on the whole was very brief, and the substance will be found in the questions and answers quoted. After stating that he owned the car, the witness was asked:

"Q. That was a pleasure car; it was not a business car? A. It was a business car. * * *

"Q. What did you use that car for? A. Well, convenience in getting around. * * *

"Q. And did you use the car in La Crosse? A. Yes, sir.

"Q. It was used by you for pleasure purposes in La Crosse? A. Well, I don't know as I was out on any pleasure trips at all.

"Q. You hadn't any business in La Crosse? A. Well, any one would have some business, having to go down to do his trading.

"Q. And did the members of your family use that car? A. Well, the car, when I was away, it was left at the city, in care of my wife."

It will be noted that the witness here is somewhat evasive.

"Q. Did your wife drive the car? A. She had learned to drive the car."

Again a little evasive.

"Q. She did drive it when you weren't at home? A. Yes, sir. * * *

"Q. Your son drove the car? A. He did, when some of us was gone.

"Q. Your daughters drove the car? A. Yes; they had learned to drive. * * *

"Q. And if one of your daughters was with him (the son), he drove it then? A. They were never allowed to go out on any pleasure trips of any kind."

Here was clearly an evasive answer.

"Q. What did you say to them along that line? A. They were never allowed. * * *

"Q. If you were not at home, who would they ask? A. Their mother, of course. * * *

"Q. And when you were out at the farm during the week, that car was used in La Crosse, if you didn't have it with you, you knew that? A. Well, that is, if my wife saw fit—

"Q. You knew that it was being used by your wife and your children? A. It was left there for her convenience in getting about, because she was not able.

"Q. And the children used it? A. The children were not allowed to go with the car without permission.

"Q. You bought that car, and kept it for the use of your family? A. Well, in a way.

"Q. In what way? A. Well, for the convenience of getting about, I would say I think it was for.

"Q. And all the members of your family did use it? A. They were not allowed to use it, outside of my wife; that is, without permission."

We think there is a shade of evasion in most of these answers, and that many of them were open to reservations.

[5] Was the venture or errand undertaken by Avis one in which the father was interested or owed a duty? Clearly the venture was not one entirely for her own benefit. Her brother was a minor living in the father's family. He had returned from the farm to the home, when his sister was in school and his mother in the hospital. The house was closed, and no one there to prepare his dinner. It is one of the obligations and duties of parenthood to provide meals for minor children. We think clearly the errand was one in which the father was interested, and in connection with which he owed a duty. Indeed, we do not understand that the trial court assumed to hold otherwise. The ruling of the court as pronounced was expressly and entirely upon the question of contributory negligence.

[6] We now come to consider the question of contributory negligence, and the error assigned in that connection. In considering this question we must take the plaintiff's testimony in its most favorable light. That testimony tends to show that plaintiff and Miss Kinney approached the Fifth street crossing about the time Avis drove the car into the intersection of Fifth and Main streets; that after stepping off the curb into Fifth street plaintiff observed the car apparently proceeding westward on Main; that it proceeded westward without any signal for turning to a point past the center of

the street, while the plaintiff was still on the west side of the Fifth street crossing; that she assumed the car was proceeding west on Main street and continued her course; that the car, after passing the center of Fifth street, suddenly, without signal, and without materially slackening speed, turned to the left and ran upon the plaintiff. Plaintiff at the time was on the north side of Miss Kinney, and there is testimony tending to show that the collision actually took place west of the center of Fifth street. We do not think in these circumstances the court as a matter of law should say that plaintiff was not justified in assuming that the car was proceeding west on Main street. Now, of course, the evidence on the situation is in sharp conflict, but we think that the conflict should have been settled by the jury.

It follows that the trial court erred in directing the verdict for the defendant, and that the case should be and is reversed.